## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

DAVID M. WILSON

                            Plaintiff,                        OPINION AND ORDER

    v.

                                                             15-cv-466-wmc

MICHAEL DITTMAN, et al.,

                           Defendants.

      *Pro se* plaintiff David M. Wilson is proceeding in this lawsuit on claims that prison staff at Columbia Correctional Institution ("Columbia") violated his constitutional rights. Specifically, the court granted him leave to proceed on: (1) an Eighth Amendment deliberate indifference claim against security director Weber for his alleged failure to provide Wilson with his Multiple Sclerosis medication; and (2) a Fourteenth Amendment due process and Wisconsin state law false imprisonment claims against defendants Michael Dittman and Weber for their part in placing him in segregation at Columbia. Now before the court is defendants' motions for summary judgment (dkt. #39) and to stay the trial and pretrial deadlines (dkt. #89), as well as Wilson's motion for assistance in recruiting counsel (dkt. #38). For the following reasons, the court will grant defendants' motion, deny the motion to stay as moot, deny plaintiff's motion and enter judgment in defendants' favor and close this case.

## I.    Parties

Plaintiff David Wilson is currently incarcerated by the State Department of Corrections ("DOC") at Columbia in Portage, Wisconsin. Wilson suffers from Multiple Sclerosis ("MS").  During all times relevant to his claims, he has been prescribed multiple medications to treat the symptoms, including copaxone, duloxetine and gabapentin. In particular, during the relevant time period:  the copaxone medication was prescribed to be administered via injection three times per week; the duloxetine was prescribed to be taken daily; and 600 mg of gabapentin was prescribed to be taken four times daily.

Both defendants were DOC employees.  Michael Dittman has been warden at Columbia since March of 2014; and Lucas Weber became the Security Director at Columbia in May of 2013.  They remain in those same positions today.

## II.    Conduct Report #2646435

On March 18, 2015, staff learned about multiple sexual misconduct allegations against Wilson.  In response, staff placed him in temporary lock-up ("TLU") pending investigation.  During Captain Pitzen's subsequent investigation, three inmates told him that Wilson either touched them inappropriately or made inappropriate comments to them. As a result, Pitzen prepared Conduct Report #2646435, accusing Wilson of violating Wis. Admin. Code § DOC 303.14 "Sexual Conduct" and § DOC 303.15 "Sexual

---

[1] The following facts are material and undisputed unless otherwise noted.  The court has drawn these facts from the parties' proposed findings of fact and responses, which includes Wilson's "Additional Proposed Findings of Fact" (dkt. #67) and defendants' response (dkt. #87).

Contact or Intercourse." It was forwarded to the Security Director's office for review on April 2, 2015. As with all conduct reports sent to his office for review, Weber reviewed Conduct Report #2646435 and allowed it to proceed as a major offense because he felt that the allegations about Wilson's behavior created a risk of serious disruption in the facility.

On April 6, 2015, Wilson received a copy of Conduct Report #2646435, and a disciplinary hearing was held on April 9, 2015, before Captain Lucas Wogernese and Unit Manager Lindsey Walker. At the hearing, Wilson requested that another inmate be allowed to testify on his behalf. He also requested all video evidence of the areas where the alleged incidents took place. While Wogernese permitted the other inmate to testify in the form of written answers to questions, Wogernese did not permit the video evidence, finding that none existed. Wogernese and Walker also received a copy of a confidential informant statement, while Wilson only received a "Summary of Confidential Informant Statement," DOC-78A, a form that provides the summary of witness testimony without identifying the witness, who might then be at risk of physical harm. In sum, the evidence before Wogernese and Walker included: (1) Wilson's verbal statements at the hearing; (2) three written confidential informant statements; and (3) other written witness statements.

Based on his interpretation of Wis. Admin. Code § DOC 303.84(6), however, Wogernese verbally concluded that the confidential informant statements did not corroborate each other at the end of the hearing. Under § DOC 303.84(6), a hearing officer may consider written statements that can be corroborated by other evidence in one (or more) of three ways: (a) by other evidence that substantially corroborates the facts

3

alleged in the statement, including an eyewitness account by an employee or circumstantial evidence; (b) by evidence of a very similar violation by the same inmate; and (c) two confidential statements by different persons, used to corroborate each other. Wogernese interpreted this policy as requiring at least two confidential informant statements about the *same* incident that corroborated each other. Because none of the confidential statements were about the same alleged incident, Wogernese told Wilson during the hearing that the evidence was not sufficient to find him guilty of the charges. Because Wogernese made no such finding in writing, however, Wilson never received a copy of that decision.

That same day, after learning about the outcome of the April 9 hearing, Security Director Weber and the Deputy Warden spoke with Wogernese and Walker about their decision. Weber disagreed with Wogernese's interpretation of § DOC 303.84(6), pointing to subsection (b), which permitted a hearing officer to consider evidence "about the same inmate making similar violations." In particular, Weber maintained that the three confidential statements that accused Wilson of either making sexual contact or sexual comments *did* corroborate one another. As a result, Weber believed that Wogernese should not only have considered those confidential statements during the hearing, but also that all of the evidence available supported a finding that Wilson was guilty of sexual misconduct and sexual contact. Weber further believed that the results of the hearing were *not* final because Wilson had yet to receive a written copy of the hearing decision. As Security Director, Weber then directed Wogernese to change the finding to guilty.

Still that same day, April 9, 2015, Wogernese changed the finding to guilty based on Weber's instructions "regarding the validity of the confidential witness statements." (Wogernese Decl. (dkt. #48) ¶ 14.) In his written decision, Wogernese wrote that he deemed the conduct report writer credible, Wilson's and his witnesses' statements self-serving, and that it was more likely than not that the events described in the report occurred because "3 separate confidential informants gave statements of 3 separate incidents where inmate Wilson had either touched them inappropriately or made inappropriate comments to them while exposing himself." (Dkt. #44-1, at 4.) Wogernese then issued a written decision that found Wilson guilty of the offenses listed in Conduct Report #2646435 and sentenced him to 240 days in segregation. The maximum amount of disciplinary separation time that Wogernese could have imposed for the violations of §§ 303.14 and 303.15 was 360 days. Wogernese justified the 240-day punishment because Wilson's overall disciplinary record was average/poor, the acts were disruptive and seriously compromised institution security and the punishment needed to deter Wilson from engaging in similar conduct in the future.[2]

The next day, April 10, 2015, Wilson was told that Wogernese had changed his finding to guilty and that he was being placed into disciplinary separation. On April 15, Wilson signed an appeal of Wogernese's decision, which the warden's office received on April 20. In his appeal, Wilson argued that: (1) the original not guilty finding was

---

[2] Under Wis. Admin. Code § DOC 303.85, hearing officers tasked with punishing serious rule violations by disciplinary segregation may consider the inmate's overall disciplinary record and any past, similar behavior, as well as the risk of disruption or serious injury, the inmate's attitude about the offense and any financial impact of the violation.

arbitrarily changed to guilty; and (2) the imposition of 240 days of disciplinary separation violated his due process rights.

Columbia's Warden Dittman was not aware of Conduct Report #2646435 until his office received Wilson's appeal. After reviewing all of the evidence, including the confidential informant statements, and Wogernese's written decision, Dittman then discussed Captain Wogernese's change from not guilty to guilty with Weber. Dittman agreed with Weber that the hearing decision only became final upon completion of the written decision, not when Wogernese verbally informed Wilson of his initial, not guilty finding. On May 6, 2015, Dittman confirmed Wogernese's decision and disposition of Conduct Report #2646435. At that point, Conduct Report #2646435 became final, which triggered his right to challenge his conviction through the Inmate Complaint Review System ("ICRS").

### III.    Inmate Complaint CCI-2015-8389

On May 8, 2015, Wilson filed Inmate Complaint CCI-2015-8389, claiming that Security Director Weber inappropriately overruled Wogernese's original finding. On June 19, the inmate complaint examiner ("ICE") recommended that Wilson's challenge be affirmed. Specifically, ICE recommended that: (1) the Conduct Report #2646435 finding Wilson guilty should be reversed; (2) Wilson should be restored to his previous security status; and (3) Wilson should receive any back-pay he would have otherwise earned but for his placement in restrictive housing. In support, ICE cited to Wis. Admin. Code Ch. DOC 303, which did not allow for a DOC security director to override a decision made by

a hearing officer at a disciplinary hearing.

After Warden Dittman received ICE's recommendation, and in particular learning that the Wis. Admin. Code Ch. DOC 303 did *not* permit Weber to change the examiner's finding of not guilty (even if yet not yet finalized in writing), Dittman proceeded to affirm ICE's recommendation as to Wilson's Inmate Complaint CCI-2015-8389 on June 26. Dittman copied Wognernese, Walker and Weber on his final decision. As a result, on Monday, June 29, 2015, Wilson was removed from the RHU and returned to Columbia's general population. In addition, Conduct Report #2646435 was removed from Wilson's institutional record, and Wilson received $10.80 in back-pay. Even so, while his grievance was being resolved, Wilson had already served some 80 days, a third of his later vacated 240-day segregation sentence between April 10 and June 29.

## IV.   Wilson's Placement in Columbia Restrictive Housing Generally

At Columbia, inmates who violate institution rules or pose a security risk may be placed in one of three restrictive housing units ("RHU"), which each impose limitations on inmates' privileges to address Columbia's security or punitive interests particular to each inmate. Two units are relevant to Wilson's placement: Restrictive Housing Unit 1 ("RH1") and Restrictive Housing Unit 2 ("RH2").[3] RH1 houses inmates who have recently been placed in restrictive housing, as well as inmates who are having ongoing behavioral problems and have been placed on observation status. RH2 is a "step-down" unit that houses inmates who previously had been held in RH1 but demonstrated improved

---

[3] The third unit is Special Management Unit ("Unit 7"). Unit 7 houses mostly mentally ill or vulnerable inmates and is not relevant to Wilson's claims in this lawsuit.

behavior.

Generally speaking, inmates in RH1 and RH2 share many of the same conditions. Inmates in both units are provided with food, clothing, bedding, health services, prescriptions, inmate complaint forms, daily mail delivery, clean linens once a week and showers twice a week. Also, both units permit inmates to possess numerous items in their cell, including: basic hygiene products, religious text, religious items, 25 personal letters, a 100-sheet stationary pad, ten photographs, an address book, 25 envelopes, legal materials, 4 magazines, 8 soft-covered books, 10 newspapers and 1 deck of playing cards. Although inmates in restrictive housing are not allowed to keep medications in their cells, staff bring inmate's medication to their cell in both units during medical pass times.[4] Inmates in both RHU's are further permitted one hour of recreation time four times per week.[5] Finally, inmates may visit the law library for one hour per week and can request additional time when they have an upcoming filing deadline.

Beyond these similarities, however, there are also a number of privileges that differ between RH1 and RH2. As to visitation and phone calls, inmates on RH1 may have one phone call and two hours of visitation per month, and inmates on RH2 are permitted two phone calls per month. Additionally, while the privileges on RH1 appear to remain consistent, RH2 uses a step policy, where inmates that progress through the steps receive more privileges. For example, RH2-Step 1 permits inmates a one-hour visit per week.

---

[4] The only inmates that are permitted to keep medications in their cell are inmates who need rescue inhalers to treat their asthma.

[5] Whether the recreation is indoor or outdoor depends on the weather.

RH2-Step 2 permits inmates a two-hour visit per week, as well as access to one electronic device.

## V. Conditions and Treatment During Wilson's RHU Placement

Following Weber's direction of a finding of guilt as to Conduct Report #2646435, Wilson was first placed in RH1 restrictive housing from April 10 until May 6, 2015. Consistent with policy, Wilson was then transferred to RH2-Step 2, where he remained until June 29, 2015. At that time, Wilson was returned to the general population consistent with his successful grievance. In other words, Wilson was on RH1 for 26 days, and RH2 for 54 days, totaling 80 days in restrictive housing. The restrictions placed upon Wilson during his time in restrictive housing were generally consistent with the restrictions imposed on other inmates in the RH1 and RH2-Step two units. However, a portion of his time in the RHU involved more restrictions due to a lockdown. Specifically, on May 7, 2015, Columbia was placed on lock-down because of an assault on a staff member that occurred in an RHU. During this time, Dittman suspended multiple privileges. (Dkts. ##53, 54, 54-1.) According to Wilson, when the lockdown was in place, in addition to not receiving his medications as prescribed, he did not receive recreation time, clean linens, or access to the law library, and was permitted to shower only once a week rather than three times. It is unclear how long the lockdown procedures were in place, but it appears that it was still in effect at least as of June 3, 2015, when Wilson exchanged correspondence with Dittman's secretary about the lockdown procedures. (Dkt. #55-1.)

## VI. Wilson's Health Treatment in the RHUs

## A. Medications

The parties dispute various facts related to whether Wilson received his medications as prescribed during his time in the RHU. As an initial matter, they dispute whether Wilson told *any* health care providers that his medications were being denied. Defendants also assert that Wilson never submitted a Health Services Request ("HSR") to the Health Services Unit ("HSU") during his stay in the RHU, while Wilson claims that he tried to submit numerous HSR's in May of 2015 during Columbia's lockdown. On May 19, Wilson underwent an MRI at UW Radiology, where he met with Dr. Frost, but there is no mention in Dr. Frost's notes at the time that Wilson reported he was not receiving his prescribed medication, while Wilson claims he told Dr. Frost that his medications were being delayed or not given. (Ex. 100 (dkt. #42-1) at 12-14.)

The parties further dispute whether Wilson was actually receiving his three medications as prescribed. Defendants point out that Wilson's HSU records include notations that he was given copaxone injections during his time in the RHU. (Ex. 100 (dkt. #42-1) at 2, 4, 7.) Still, Wilson claims he did not receive three injections per week, plus his HSU records appear to confirm only one injection per week, because the copaxone line was only signed on Mondays. Given these apparent inconsistencies, the court agrees that the records are unclear at best, and certainly do not, as defendants claim, "speak for themselves," unless it is to say Wilson's receipt of his prescribed medication was "spotty." Indeed, his treatment records show notations for copaxone in initialed boxes, empty boxes and boxes with an "x" in them, all during the time period that Wilson was held in segregation.

Moreover, defendants acknowledge that Wilson may have missed 13 days of his duloxetine medication between April and June, and Wilson claims he missed even more days. According to Columbia's physician, missing "a few doses" of duloxetine may result in mild withdrawal symptoms. Similarly, defendants admit that Wilson missed 51 of the 324 doses of gabapentin while in segregation, and Wilson claims that he missed many more than 51.

Finally, the parties do not agree what defendant Weber knew (or should have known) as the security director about the medications Wilson was and was not receiving while in the RHU. Wilson claims that while he was in restrictive housing -- possibly on April 28, 29, or 30, 2015 -- he complained to Captain Boodry that he was not receiving his Multiple Sclerosis medication, and Boodry responded that he would email Weber about his medication. Along with Wilson's own declaration, plaintiff submitted the declaration of another inmate who claims to have heard that same conversation. (Johnson decl. (dkt. #72) at 1-2.) Wilson claims that he also followed up with Captain Boodry on July 4, shortly after his release from restrictive housing, and that Boodry said he had emailed Weber "several times" about his medications, but never heard back. (Wilson decl. (dkt. #15) at 1-2.) Boodry does not deny having a conversation like this with Wilson, but also does not remember it. Moreover, Boodry avers that he would not normally have reported a medication issue to Weber, unless it involved the risk of self-harm, overdosing or a security breach. Rather, he would have contacted HSU about Wilson's complaint.

As Security Director, defendant Weber similarly does not remember receiving such

an email from Boodry. He adds that he conducted a search of his email "vault" but was unable to locate any email from Boodry about Wilson. Further, both defendants Dittman and Weber aver that they were unaware of Wilson's medical conditions or medication needs while he was in restrictive housing. Both also aver that they had no reason to believe Wilson did not receive his medications. Regardless, Wilson claims that without his medication, he suffered from great pain and temporary loss of mobility in his limbs.

### B. Psychological Cure

When inmates arrive at Columbia, they undergo a health screening and receive one of four Mental Health Classifications: MH-0 (inmate does not have a current mental health need and has no need for follow-up); MH-1 (inmate is receiving mental health services but does not suffer from a serious mental illness); and MH-2a or MH-2b, which both mean that the inmate has a current diagnosis, but with differing levels of severity. These classifications provide Columbia staff with guidance in providing inmates with appropriate psychological treatment.

Wilson's medical records indicate that he has always been classified as MH-0 at Columbia (Ex. 101 (dkt. #43-1)), although defendants acknowledge that he started to receive mental health care during his stay in segregation. In particular, on May 5, 2015, a little over three weeks after his placement in segregation, Wilson met with a psychologist, who noted Wilson's mood to be "anxious and depressed," but ultimately did not change his Mental Health Classification because he was managing well. (*Id.*) While defendants represent that Wilson did not seek out mental health care again until June of 2016, Wilson

claims that he *did* seek further treatment and talked to a psychologist several times at his cell door.

OPINION

## I.    Eighth Amendment

Wilson claims that Security Director Weber violated the Eighth Amendment by acting with "deliberate indifference" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  Defendant Weber seeks summary judgment both because Wilson failed to exhaust his  administrative remedies and his claim lacks merit on the undisputed facts.

### A.  Exhaustion of Administrative Remedies

The parties do not dispute that Wilson failed to exhaust his administrative remedies, but dispute whether Wilson *tried* to exhaust and was prevented from doing so, which could mean that the grievance process was effectively not available to him.  *See Kaba v. Stepp*, 458 F.3d 678, (7th Cir. 2006) ("[A] remedy becomes unavailable if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting.") (citation omitted).   In particular, Wilson maintains that he submitted a complaint to a guard, but the guard failed to follow through by submitting it for review by ICE.

Since Wilson provides no actual evidence or information about his specific efforts to exhaust, there would appear no genuine issue of material fact to avoid judgment on exhaustion grounds.  In light of Wilson's *pro se* status, however, the court would normally

give him the opportunity to provide more specific information before ruling on this issue. Rather than delay this matter further, the court will move on to address the merits because: (1) the parties have already submitted evidence and briefing allowing a decision on the merits of Wilson's deliberate indifference claim against Weber; and (2) judgment in Weber's favor is plainly appropriate.

### B. Deliberate Indifference

On the merits, defendant Weber argues that there is no evidence that he acted with deliberate indifference to Wilson's serious medical need. Since there is no dispute that Wilson's MS constitutes a serious medical need, the only relevant inquiry is whether the evidence of record would support an inference that Weber acted with deliberate indifference to this need.

For a prison official to act (or fail to act) with "deliberate indifference" means that he or she "'knows of and disregards an excessive risk to inmate health or safety.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 837). "[S]pecifically, he must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id.* (internal quotation omitted); *see also Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006) (deliberate indifference is "akin to criminal recklessness, which requires that the defendant be aware of and disregard an excessive risk of serious harm to the inmate").

The fatal problem with plaintiff's Eighth Amendment claim is the absence of *any* evidence supporting an inference that Weber actually knew anything about Wilson being denied proper access to his medications. *See Pittman v. County of Madison, Ill.*, 746 F.3d

766, 778 (7th Cir. 2014) (to establish liability for deliberate indifference under § 1983, a plaintiff must show that the defendant had "actual knowledge" of the risk of serious harm); *Belbachir v. County of McHenry*, 746 F.3d 766, 778 (7th Cir. 2013) (affirming dismissal of nurse because there was no evidence that she knew that a prisoner was suicidal).

Although Wilson and another inmate claim that Boodry said he would email Weber that Wilson was not receiving his MS injections properly, Boodry does not corroborate this statement, nor a later one in which Wilson claimed Boodry confirmed sending emails "several times," because he does not remember either conversation with Wilson, nor sending the email.  In fact, in his declaration, Boodry maintains that his general practice calls into question his supposed actions, adding that it would have been out of the ordinary for him to email Security Director Weber about a prisoner's health needs, unless there was a possibility of an overdose, self-harm or a security breach.  Thus, while Boodry does not outright contradict Wilson's version of their interactions, neither does he buttress it, meaning that Boodry's statement to Wilson and another inmate that he would email Weber, and his later statement to Wilson that he did so, are both inadmissible hearsay, at least for the truth of the matter asserted.

Even assuming that Boodry *did* tell Wilson and another inmate that he would email Weber, and then later told Wilson that he did so, the court would need to bridge the gap between Boodry and Weber to infer *Weber's* actual knowledge by assuming facts not in evidence, at least without Weber actually admitting receipt (from Boodry or someone else) or an email from Boodry to Weber on the subject of Wilson's MS medications.  Otherwise, a reasonable fact finder could only speculate that Weber actually knew Wilson had

reported not receiving his medication as prescribed. *See Sybron Transition Corp. v. Security Ins. Co. of Hartford*, 107 F.3d 1250, 1255 (7th Cir. 1997) ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion.").

Summary judgment is the stage where Wilson had to submit more than a "scintilla of evidence in support of his position," such that a jury could reasonably find in favor of his position. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("Summary judgment is the 'put up or shut up' moment in a lawsuit."). Although Wilson had the opportunity during discovery to obtain any emails he claims Boodry sent to Weber, Wilson has not submitted that evidence, nor otherwise contradicted Weber's representation that he does not possess those emails. Because Wilson has submitted no other, admissible evidence supporting his assertion that Boodry emailed Weber, much less that Weber received it, read it *and* refused to act on it, the court is left with no evidence to permit an inference that Weber had "actual knowledge" Wilson was complaining about his MS medications. *See McAdory v. Frank*, No. 14-cv-0942, 2016 WL 1677231, at *5 (E.D. Wis. Apr. 26, 2016) (concluding that plaintiff's claim that a nurse told him that he emailed the defendant about a bunk assignment issue did not create a dispute of material fact as to the *defendant's* knowledge because plaintiff had not submitted a supporting affidavit from the nurse nor the alleged email). Accordingly, no reasonable jury could to believe that Weber had the requisite knowledge to be liable for any failure to remedy Wilson's MS medication administration.

## II.     Due Process

Wilson is also proceeding on a Fourteenth Amendment due process claim against both defendants Weber and Dittman based on their involvement in overturning the original "not guilty" ruling, which then resulted in his punishment of 240 days in segregation. A prisoner challenging the process he was afforded in a prison disciplinary proceeding must prove two thing: "(1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient." *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007). Defendants seek judgment as to both prongs of the due process analysis.

### A. Liberty Interest

The first element is met "if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009); *see also Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014). As to the length of confinement, the Seventh Circuit Court of Appeals has not set a bright-line rule, but as much as six months in "ordinary" segregation has been held insufficient to be an atypical and significant hardship. *Hardaway v. Meyerhoff*, 734 F.3d 740, 743-44 (7th Cir. 2013). That said, even a short term of segregation may "give rise to a prisoner's liberty interest" when accompanied with "exceptionally harsh conditions." *Id*.

Under current Seventh Circuit case law, the length of Wilson's stay alone would not establish a liberty interest, since he was housed in RHU1 for 26 days and RH2-Step 2 for 54, at which point he was returned to general population. This total of 80 days in

segregation-type conditions, while borderline, has generally not been held sufficient to support a finding of a liberty interest for purposes of due process. *See, e.g., Lekas v. Briley*, 405 F.3d 602, 612 (7th Cir. 2005) (90 days insufficient); *Thomas v. Ramos*, 130 F.3d 754 (7th Cir. 1997) (70 days insufficient).

The analysis does not stop there, however, because Wilson avers that various aspects of his specific conditions rendered his time in the RHU an atypical and significant hardship.[6] Specifically, Wilson complains of the conditions he personally dealt with during his time in the RHU. As an initial matter, Wilson notes the unique conditions he faced during a lockdown at Columbia, which began May 7, 2015, and ended at some point in June. Wilson claims that during this time he did not receive recreation time, clean linens or access to the law library, and that he could only shower once a week. Wilson acknowledges that the lockdown was in place after an inmate assaulted a guard in restrictive housing, and in such circumstances, Columbia officials had the authority to impose policies necessary to restore order and security. *See Hewitt v. Helms*, 459 U.S. 460, 474 (1983). So the question is whether these additional limitations support finding that the conditions with which Wilson was dealing during this time period were unduly harsh. While a closer question, the court finds that these conditions alone, which appear to have been imposed on all inmates for a few weeks, fall short of this standard. *See Thomas*, 130 F.3d at 760-61 (no liberty interest when a prisoner's experience with lockdown procedures

---

[6] Wilson does not dispute that, for the most part, he had access to the same types of privileges generally available to prisoners housed in these units, including limited phone call and visitation periods, various personal items, food, clothing, bedding, health services and prescriptions, inmate complaint forms, mail, linens and twice weekly showers. Additionally, Wilson does not dispute that he had access to four hours of recreation time per week and access to the law library.

did not differ from the conditions of general population during lockdown).

Wilson does claim, however, more serious, specific hardships arising out of a failure to treat both his physical and mental health needs while in segregation. As to his mental health alone, the evidence of record simply does not support Wilson's position. While Wilson alleges that his mental health deteriorated while he was housed in RHU, and he requested to see a psychologist several times, Wilson does not dispute that he did, in fact, talk to a psychologist on multiple occasions. As such, the record of Wilson's mental health requests and treatment suggests that he was receiving the same type of care he would have received in general population. Furthermore, while Wilson argues that his mental health assessment changed *after* his stay in the RHU, the evidence of record does not suggest that Wilson's mental health status changed, only that the PSU was responding to his requests for treatment.[7]

In contrast, Wilson's claim that when he was in the RHU, he was not receiving his MS medications as prescribed and suffered severe pain and loss of mobility, may well support a finding that he was dealing with overly harsh conditions, or so a reasonable jury could find. *See Townsend*, 759 F.3d at 687 (recognizing that segregation conditions can give rise to an Eighth Amendment claim and implicate liberty interest under the Fourteenth Amendment due process claims). While defendants argue that Wilson's medical care was proper and he could not have been suffering severe symptoms as a result of missing a few

---

[7] Given the growing literature on the psychological effects of even short periods of segregation, this court does not mean to minimize its impacts on the plaintiff here. Rather, the court is simply finding that the mental health impacts on this defendant have not been shown to give rise to more than what could be expected for any inmate and, as such, current Seventh Circuit case law does not support a finding of "exceptionally harsh conditions." *Hardaway*, 734 F.3d at 743-44.

doses, Wilson disputes that -- specifically averring that he suffered from severe pain and lost mobility in his limbs. As such, a credibility finding is required, which is inappropriate at this stage.

### B.  Procedures

Even assuming that Wilson's time in the RHU involved a liberty deprivation, however, a prisoner facing transfer to and confinement in segregation is still only "entitled to informal, nonadversarial due process." *Westefer v. Neal,* 682 F.3d 679, 684 (7th Cir. 2012) (citing *Wilkinson v. Austin,* 545 U.S. 209, 211-12 (2005); *Hewitt v. Helms,* 459 U.S. 460, 476 (1983)). This "requires 'some notice' of the reasons for the inmate's placement . . . and enough time to 'prepare adequately' for the administrative review." *Westefer,* 682 F.3d at 684. The actual review itself "requires only that the inmate be given an 'opportunity to present his views'" to a neutral decisionmaker. *Id.* at 685. As to the neutral decision-maker requirement, where "an officer is substantially involved in the investigation of the charges against an inmate, due process forbids that officer from serving on the [hearing] committee." *Whitford v. Buglino*, 63 F.3d 527, 534 (7th Cir. 1995).

Here, Wilson is not challenging the conduct report hearing process, but rather defendant Weber's decision to step in and direct Wogernese to change the finding from "not guilty" to "guilty," and then defendant Dittman's affirmance of that decision. At screening, the court concluded that Wilson's allegations permitted an inference that Weber was not a neutral decision-maker, but rather punished him arbitrarily. Now that the parties have submitted evidence as to Weber's reasoning, however, it is apparent that a reasonable

jury could not find Weber's decision to intervene, while ultimately found to be mistaken about DOC regulations, constituted arbitrary punishment under the Fourteenth Amendment.

On the contrary, the evidence of record indicates only that Weber was following through with what he believed to be his responsibilities as Security Director. Specifically, Weber avers that he: (1) interpreted § 303.84(6) differently from Wogernese, and (2) believed in good faith that he had the authority as security director to overrule Wogernese if he believed the wrong conclusion was reached. Moreover, Weber did not initiate Conduct Report #2646435 and had only been tangentially involved in reviewing the report. *See Whitford*, 63 F.3d at 534 ("Tangential involvement in the investigation, however, does not disqualify an officer from sitting on the adjustment committee.") (citation omitted). Instead, Captain Pitzen investigated the underlying allegations of sexual misconduct and prepared the conduct report. Weber first learned about Conduct Report #2646435 when his office reviewed it and he determined that it may proceed to hearing as a major offense. Nothing about Weber's review suggests that he concluded arbitrarily Wilson was guilty, was attempting to tilt the scales against him, or took any action that would otherwise suggest that he was not neutral. Rather, all the evidence supports the conclusion that Weber was correcting what he believed was a misinterpretation of DOC regulations, not a factual finding by the hearing examiner. Moreover, it was *Wogernese*, not Weber, who ultimately made the guilty finding, including in his list of reasons that Wilson and his witness were not credible, and that the conduct report writer and three confidential informant statements were. While Weber's concession

that he told Wogernese that there was enough evidence to make a guilty finding is troubling, Wogernese's written decision includes his own factual findings. Indeed he explained that he changed the result to guilty because of the validity of the confidential witness statements confirming that it was only his reading of the regulation that stopped him from reaching a guilty finding overall at the hearing. Wogernese also independently imposed the punishment that Wilson is now challenging. Given that Wilson has submitted no evidence that would permit an inference that either Weber or Wogernese was biased against him in any way, no reasonable jury could conclude that Wilson was denied the informal, non-adversarial process he was due. *See Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003) ("the constitutional standard for impermissible bias is high").

The result is the same as to defendant Dittman, who was another step removed from the disciplinary proceedings than Weber, and simply found that Weber had the authority to intervene with Wogernese. Since Warden Dittman had no other involvement in the investigation into or resolution of Conduct Report #2646435, there are also no facts supporting a finding that he was not a neutral decision-maker.

In the end, Wilson has failed to submit any evidence that would permit an inference that either Weber or Dittman acted arbitrarily in an effort to punish Wilson regardless of guilt by playing the roles they did in the disposition of the conduct report. Accordingly, judgment will also be entered in defendants' favor as to Wilson's due process claim.

### III. False Imprisonment

Finally, while the court granted Wilson leave to proceed on a state law false imprisonment claim, the evidence now shows that he failed to file a notice of this claim as required by Wis. Stat. § 893.82. A plaintiff must file a notice of claim with the Attorney General to commence suit against a state officer, employee or agent:

> [N]o civil action or civil proceeding may be brought against any nonprofit corporation operating a museum under a lease agreement with the state historical society, unless within 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death and the names of persons involved, including the name of the state officer, employee or agent involved.

Wis. Stat. § 893.82(3). Compliance with this statute is a jurisdictional prerequisite to proceeding with a state law claim against a state official. *Ruh v. Samerjan*, 816 F. Supp. 1326, 1330 (E.D. Wis. 1993) (citing *Ibrahim v. Samore*, 118 Wis. 2d 720, 726, 348 N.W.2d 554 (1984)).

Since it is undisputed that Wilson did not file a notice of claim against defendants Weber or Dittman for false imprisonment, this claim cannot proceed. Wilson claims that he did not need to file a notice of claim because he is asserting a *federal* false imprisonment claim, but that was not the claim that the court permitted him to proceed upon, and even if it were, a federal false imprisonment claim does not apply to prison conditions. *Perrault v. State*, No. 15-cv-144, 2016 WL 126918, at *3 (W.D. Wis. Jan. 11, 2016). Accordingly, the court will grant defendants' motion as to the false imprisonment claim as well.

## IV.     Motion for Assistance in Recruiting Counsel (dkt. #38)

Finally, the court is denying Wilson's motion for assistance in recruiting counsel. The court previously denied Wilson's requests for counsel because Wilson's submissions did not persuade the court that the complexity of this case exceeded Wilson's ability to litigate it. *Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007). While Wilson now claims that he has been relying on jailhouse lawyers who are not available to him anymore, his submissions suggest the opposite. In considering defendants' motion for summary judgment, the court relied on Wilson's legal and factual opposition materials and determined that Wilson adequately represented himself. Indeed, as noted above, Wilson successfully submitted sufficient evidence to create issues of material fact related to various issues. While ultimately unsuccessful, Wilson's submissions were not so clearly inadequate that he needed the assistance of an attorney to represent him at the summary judgment phase. As the court has previously noted in this case, even though pro bono counsel may have been more effective than Wilson, that is not the standard. *Pruitt*, 503 F.3d at 655 ("if that were the test, district judges would be required to recruit counsel for every indigent litigant"). Accordingly, as Wilson has continued to demonstrate that the legal and factual complexity of this case did not exceed his abilities, his request for assistance in recruiting counsel is denied.


## ORDER

IT IS ORDERED that:

(1) Defendants' Motion for Summary Judgment (dkt. #39) is GRANTED.

(2) Defendants' motion to stay (dkt. #89) is DENIED as moot.

(3) Plaintiff's motion for assistance in recruiting counsel (dkt. #38) is DENIED.

(4) The clerk of court is DIRECTED to enter judgment in defendants' favor and close this case.

Entered this 19th day of December, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge